## KRELL ET AL. *v.* THE KRELL PIANO CO.

*Corporations — Sale of entire assets — Sections 8710 to 8718, General Code — Right of common stockholders to vote — Articles of incorporation govern, when — Sale by preferred stockholders valid, when — Review by court of appeals.*

1. Sections 8710 to 8712, General Code, providing for the sale of the entire property of a corporation upon a vote of three-fourths of the stockholders thereof, are complied with if more than three-fourths of the preferred stockholders vote for the sale, even although the common stockholders are not permitted to vote at the meeting held for the adoption or rejection of the resolution of sale, where the articles of incorporation of such corporation provide that the preferred stockholders are not entitled to any voting power at the meetings of stockholders of the corporation unless default shall have been made by it in the payment of six or more semi-annual preferred dividends, in which event the preferred stockholders shall have the sole voting rights to the exclusion of the common stockholders, and where no dividends were ever paid on the preferred stock and the company has defaulted for more than six semi-annual payments.

2. In an action to set aside a sale of assets of a corporation and to enjoin the carrying out of the sale and appointment of a receiver, the court of appeals, on error, will not set aside the judgment of the trial court unless manifestly against the weight of the evidence.

(Decided March 21, 1921.)

ERROR: Court of Appeals for Hamilton county.

*Mr. James B. Swing* and *Mr. Theo. Horstman,* for plaintiffs in error.

*Messrs. Ernst, Cassatt & Cottle,* for defendant in error.

HAMILTON, P. J. This action was instituted by the plaintiffs in the superior court of Cincinnati, seeking to set aside the sale of the assets of the

defendant, The Krell Piano Company, to enjoin the carrying out of the sale, and the appointment of a receiver.

The original petition set up as grounds for setting aside the sale that it was a sale of the entire assets of the company, within the meaning of Sections 8710 to 8718, inclusive, General Code of Ohio, and that the provisions of these sections had not been complied with, in that the holders of the common stock had not been permitted to vote on the question of the sale at the meeting of the company, held pursuant to the notice given, under the provisions of the statute; that at said meeting, so held, only the owners of preferred shares of the company were permitted to vote to consummate the sale, although the holders of the common stock were present in person or by proxy, and tendered their vote against the resolution; and that if the holders of the common stock had been permitted to vote and to have their votes counted the same would have constituted a majority of all the stock of the defendant company.

In the second amended petition two causes of action are set up. The first cause of action reiterates the allegations of the petition as above set forth, and in the second cause of action facts are alleged seeking to charge Lawrence Maxwell, and the officers and directors of the Krell Company (none of whom are made parties to this action), with unfair dealing to the detriment of the plaintiffs in the sale of the assets of The Krell Piano Company, charging in substance that Maxwell, while acting as attorney for the defendant company, and being the owner of the majority of the

preferred stock of the defendant company, and having control of the board of directors of the defendant company, made the sale to the Werner Industries Company; and that Maxwell was the owner of the Werner Company, with the exception of four shares, one to each of the four directors, he being the fifth director thereof. In other words, that Maxwell was both the vendor and vendee of the assets and thereby took undue advantage of the plaintiffs and the defendant company by virtue of his control of both companies.

The first question for determination is: Were the provisions of Sections 8710 to 8712, inclusive, General Code, complied with as affecting the legality of the sale?

Assuming, without deciding, that the sale constituted the sale of the entire property and assets within the meaning of the statute, we are of opinion that the requirements of the statute were met upon the three-fourths vote of the preferred stock, voting at the meeting, approving the sale. The articles of incorporation of the defendant, The Krell Piano Company, provided: "Said preferred stock shall be entitled to yearly dividends of 7 per cent, which dividends shall be cumulative and payable semi-annually, and said preferred stock shall be preferred both as to dividends and as to assets in the event of dissolution, but shall not be entitled to any voting power at the annual or other meetings of the stockholders of said corporation, unless default shall have been made by it in the payment of six or more of said semi-annual preferred dividends, in which event the holders of said preferred stock shall have sole voting rights, to the exclusion

of the holders of its common stock." No dividends were ever declared or paid by the company on its preferred stock, and it had defaulted for more than six semi-annual dividends. Whereupon, the preferred stock became entitled to the sole voting rights, to the exclusion of the holders of the common stock.

Under the provisions of Section 8712, General Code, the adoption or rejection of the sale of the assets is upon vote by ballot. The common stockholders having, by virtue of the articles of incorporation, lost all voting rights by the default therein provided, how may it be said that they still possessed the right to vote on the proposition by which the owners of the preferred stock were endeavoring to protect their interests, the very thing for which the articles of incorporation provided? The common stockholders took their shares knowing of and subject to these restrictions, and fully cognizant of the fact that upon the happening of the conditions they would be barred from any and all voting power and that the preferred stock under the conditions named should have sole voting rights. Any other view would, in effect, take away from the preferred stock the protection provided in the articles of incorporation. We know of no law and none has been cited by counsel which forbids a corporation and its stockholders from making any restrictions they please in regard to the voting power, which is in the nature of a contract between the corporation and its stockholders. 2 Cook on Corporations (7 ed.), Section 622b; 1 Machen on Corporations, Section 570; 1 Thompson on Corporations (2 ed.), Section 859; 3 Clark & Marshall on

Private Corporations, 1996; *State, ex rel. Frank,* v. *Swanger,* 190 Mo., 561, and *Miller, Exr.,* v. *Ratterman,* 47 Ohio St., 141.

Section 8712, General Code, must, therefore, be construed with reference to the articles of incorporation of the defendant. The conditions giving the sole voting rights to the preferred stock, the common stockholders were not entitled to vote at the meeting held for the adoption or rejection of the resolution of sale, and more than three-fourths of the preferred stock voting to adopt the resolution of sale, the sale was legal as against this objection.

The second question is: Are the plaintiffs entitled to relief by reason of any proof of bad faith on the part of Maxwell and the officers and directors of the Krell company?

We think under the circumstances of this case, on the conceded facts, that it was incumbent upon Maxwell and the directors and officers of the defendant company to show that they have dealt fairly with the Krell Piano Company and its stockholders. (*Truman* v. *Coghlin Machinery & Supply Co.,* 11 Ohio App., 220, and cases there cited.) In determining this matter, we have not the same liberty in considering the facts as if the case were heard *de novo* on appeal. The case is here on error from the judgment of the superior court. The case was tried to the court, and that judgment, like the verdict of the jury, will not be set aside unless manifestly against the weight of the evidence. *Breese* v. *State,* 12 Ohio St., 146; *Landis* v. *Kelly,* 27 Ohio St., 567; *Scott* v. *Perlee,* 39 Ohio St., 63, 65; *Henkle* v. *Salem Mfg. Co.,* 39 Ohio St., 547, 552; *Reed* v. *Board of Education,* 39 Ohio St., 635, 638; *P., C.*

& St. L. Ry. Co. v. Howard, 40 Ohio St., 6, 8; Eleventh Street Church of Christ v. Pennington, 18 C. C., 408, and Cincinnati Traction Co. v. Harrison, 24 C. C., N. S., 1.

We approach the consideration of the evidence under the rule that the judgment of the trial court will not be disturbed unless the record shows clearly and satisfactorily that the judgment is manifestly against the weight of the evidence. In this connection the credibility of the witnesses cannot be considered, and where the evidence is merely conflicting the determination of the trial court as to such evidence will not be disturbed. While we cannot undertake to discuss in detail the great volume of evidence submitted, the outstanding facts and important features of the evidence are as follows:

It appears that in November, 1911, The Krell Piano Company, located in Cincinnati, of which Albert Krell, the chief party plaintiff herein, was director and president, was in financial difficulty, requiring a reorganization and infusion of new capital. The majority of the preferred stock in the Krell Piano Company was owned by the heirs of Andrew Hickenlooper, who were threatening the company with liquidation. November 13, 1915, Mr. Maxwell was procured to take over the Hickenlooper stock. This stock gave Mr. Maxwell the controlling interest in the preferred stock, for which he paid $25,000. In the new organization the only common stock issued was in the amount of $150,000 to Albert Krell and his associates in consideration of a transfer to the Krell Piano Company of certain shop rights in patents for piano players, and, thereupon, by virtue of this issue,

Krell and his associates acquired the exclusive voting power and control of the Krell Piano Company.

Notwithstanding the reorganization of the company it continued in financial difficulty. About a month after Maxwell became the owner of the Hickenlooper stock, he loaned $9,000 to the company, and about a month later an additional $1,000. The company continued to meet with financial embarrassment in the conduct of its business, and became more and more involved under the management of Krell as president and chairman of the board of directors, and E. B. Pfau as secretary-treasurer. Krell, as president, borrowed large sums of money for the company on his own initiative, as much as $75,000 at one time. While those loans were subsequently approved by the board of directors, it shows the complete domination of the company by Krell. It appears that Maxwell continued to back the company, both by furnishing money and endorsing notes until he became involved in approximately the sum of $100,000, and he thereupon began to take steps to protect his interests.

It is claimed by the plaintiffs that Maxwell was protected at least in part by piano leases, and was in no danger of losing, but the quality of the security, depending on the payments by purchasers of pianos and other instruments, was not such security as to justify a feeling of safety on the part of Maxwell. Further, it is shown that some $10,000 of the securities were collected by Krell and his associates in the management and directed to the use of the campany, instead of discharging the liability to Maxwell.

It is claimed by plaintiff in error that Maxwell employed Ernst & Ernst to make an audit of the company in May, 1916. The minutes of the meetings of the company, introduced in evidence, show, however, that at the meeting of the company on July 7, 1916, Chairman Krell reported that he had employed Ernst & Ernst to audit and make an inventory of the company's assets. This action was approved by the directors. These minutes were approved and signed by Krell, as chairman. The audit of Ernst & Ernst was returned to the company, together with the inventory made by them and a certificate attached by Krell as president of the company and chairman of the board of directors certifying to the truthfulness and accuracy of the report. This report showed that the company in 1915 had a net loss of $44,926,26, and in 1916 a net loss of $26,714.40.

With this audit before them, to continue the company and to avoid bankruptcy, in October, 1916, and November, 1916, Maxwell again endorsed to the extent of $40,000 for the company. With this audit before the stockholders at the annual meeting held January, 1917, the financial situation of the company was discussed and the advisability of liquidation or sale of the business was fully gone into. At this meeting, by action of the stockholders, a committee was appointed to sell the assets of the company, or to present and report plans for liquidation in order to avoid bankruptcy. This committee consisted of Conroy, Maxwell and Hauck, Conroy and Hauck being members of the board of directors. Maxwell was not at this time, or at any

other time a member of the board of directors. On February 2, 1917, the committee, with Krell still as president, reported that they were unable to effect a sale, that the financial situation of the company was acute, and at this meeting Hauck, Schell, Conroy and Maxwell announced their willingness to relinquish their stock and surrender the same to the company provided the debts of the company should be taken care of, and asked Mr. Krell to do this, which Krell was unwilling to do, but asked for time in which to make a sale of the concern.

On February 9, 1917, occurred the election of the board of directors. In the meantime the voting privileges had been assumed by the preferred stockholders under the provision in the articles of incorporation, by virtue of default in the payment of semi-annual dividends. Krell was elected as one of the directors but declined to qualify or serve as such director. The committee continued to endeavor to find a purchaser for the plant as a going concern, and the evidence shows extended research and thorough investigation in an endeavor to find a purchaser.

In the meantime the company was unable to meet its payroll, and money was advanced either in cash by Maxwell, or upon his credit to meet the payroll. This continued until August, 1917, at which time the committee again reported that they were unable to effect a sale, and Mr. Maxwell reported an arrangement with Mr. H. J. Werner, president of The American Photo Player Company, by which a new company was to be organized to be known as the Werner Industries Company, in which he would be interested, and he stated that Mr. Werner would

make a proposition on the succeeding day for the assets of the company.

At this time the debts of the Krell company were over $280,000, some of which were pressing. Krell and his associates were unable to supply any financial assistance, or furnish a plan to save the company from bankruptcy.

The Werner Industries Company was organized and Mr. Werner and Mr. Maxwell met with the Krell Company, and, after some negotiations, submitted a proposition to take over the assets of the Krell Company, with the exception of some real estate in Michigan, cash in bank, accounts, leases, bills and notes receivable, and to pay therefor $155,000 of the preferred stock of the Werner Industries Company.

It appears that Mr. Maxwell was the sole owner of The Auto Grand Piano Company of Connersville, Indiana, which was a prosperous and going concern, and which he had acquired at a bankruptcy sale some time previous.

The Werner Industries Company was organized with a capital stock of $765,000, Maxwell to put in the Auto Grand Piano plant, he to hold all the stock, Werner to have the option of purchasing the controlling interest of the stock in the Werner Company, and he to be the president and manager of the same.

The evidence fully sustains the claim of defendant that it was a case of accepting the Werner company's offer, or bankruptcy for the Krell company.

It is contended by plaintiffs that the value of the stock of the Werner company is greatly below par,

has no market value, and is a "mere scrap of paper;" that Maxwell being the owner of the Werner Industries Company acquired the valuable property of the Krell company, therefore, without paying anything for it.

Under the facts briefly touched upon there can be no question but that the directors and officers of the Krell company and Mr. Maxwell acted in good faith in the sale of the assets of the Krell company to the Werner company, unless the stock of the Werner company was of no value, or the value so inadequate as to work a fraud.

The adequacy of the consideration for the assets of the Krell Piano Company taken over by the Werner Industries Company must be considered in the light of the impending bankruptcy of the Krell company at the time of the sale. The preferred stock of the Werner company was in the sum of $485,000, 7 per cent. cumulative. Of this preferred stock, $330,000 was issued to Maxwell for the plant and property of the Auto Grand Piano Company, of Connersville. According to undisputed evidence the Krell Auto Grand Piano Company was an up-to-date plant, owned in fee simple, with machinery, equipment, patents, inventoried stock and other property, and was a profitable going business, and, according to testimony of Mr. Krell, at the time the assets were purchased by Maxwell at the bankruptcy sale of the Auto Grand Piano Company plant it was worth not less than $400,000. The evidence fully sustains the proposition that the Krell Auto Grand Piano Company was well worth the issued preferred capital stock. The inventoried value of the assets of the Krell company taken over

was approximately $145,000. For these assets, as before stated, was given the sum of $155,000 in the preferred stock of the Werner company. While the testimony of plaintiff's witnesses places the value much higher, the chief amount of increase of value is based on good will and shop rights in patents which would be of little value to an insolvent company, not able to operate as a going concern.

The assets of the Krell Piano Company taken over consisted of machinery, parts for manufacturing purposes, factory lease, partly constructed instruments, and some manufactured property in stock. It is a matter of common knowledge that in a forced sale in bankruptcy such assets become practically dead stock and greatly depreciated in value. An example of this is shown by the evidence adduced in this case of the sale of the Auto Grand Piano Company at Connersville, when, at public sale, assets appraised at $225,000 were purchased by Mr. Maxwell for $80,000.

Estimating the value of the Werner preferred stock as stock values must be estimated, on the basis that the assets of the Krell Auto Grand Piano Company alone were easily worth the full amount of its preferred stock, that it was a going concern, and free from debt, we see no reason for valuing the stock at less than approximately the par value thereof. The Krell company being the owner of this preferred stock is in a position to protect itself with reference thereto. Further, it is clear that taking into consideration the relative debts and assets of the Krell company, under no possibility could the plaintiff stockholders have realized any-

thing on their stock under any method of liquidation, and they as individuals are in no wise injured by the transaction.

The question as to the right of the plaintiffs to maintain this action against the Krell Piano Company, sole defendant, was not raised in the court below, and is not considered here.

We find no error in the record and the judgment will be affirmed.

*Judgment affirmed.*

CUSHING and BUCHWALTER, JJ., concur